UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 06-4251(DSD/SRN)

Roxanne Richardson,

       Plaintiff,

v.                                                    **ORDER**

Todd Turpitt, in his
individual and official
capacities, Craig Martin,
in his individual and official
capacities, Jeff Burchett, in
his individual and official
capacities, Steve Kritzeck,
in his individual and official
capacities and County of
Hennepin, Minnesota,

       Defendants.

       Jill Clark, Esq., Jill Clark P.A., 2005 Aquila Avenue
North, Golden Valley, MN 55427, counsel for plaintiff.

       Toni A. Beitz, Hennepin County Attorney's Office, 300
South Sixth Street, Suite C-2000, Minneapolis, MN 55487,
counsel for defendants.

       This matter is before the court upon defendants' motion for summary judgment. Based upon a review of the file, record and proceedings herein, and for the reasons stated, the court grants defendants' motion in part.

## BACKGROUND

       On May 13, 2004, the state of Minnesota charged plaintiff Roxanne Richardson ("Roxanne") with conspiracy to commit aggravated first degree witness tampering based on communications with her

husband Willie Richardson ("Willie") while he was detained at the Hennepin County Adult Detention Center ("ADC") for allegedly sexually assaulting her eighteen-year-old daughter, L.L., in January 2004. As a result, Roxanne was arrested and detained at the ADC until a state court judge ordered her release for lack of probable cause on October 22, 2004. Roxanne now challenges the adequacy of the investigation by Hennepin County law enforcement officials that resulted in her arrest and detention.

In April 2004, defendant Detective Craig Martin ("Martin") interviewed a confidential informant known as "Flacko" at the ADC about narcotics. During that interview, Flacko mentioned that Willie had asked him to kill L.L.[1] Although this information was unrelated to the narcotics investigation, Martin believed Flacko was credible because his narcotics information was accurate. (Martin Dep. at 35, 60.) In response, the Hennepin County Sheriff's Office opened an investigation and assigned defendants Detectives Jeff Burchett ("Burchett") and Steve Kritzeck ("Kritzeck") to the case. (Clark Aff. Ex. 1.)

Martin and Burchett interviewed Flacko on April 27, 2004, for thirty minutes to one hour. After that preliminary interview, Flacko provided the following transcribed statement:

---

[1] Martin indicates that Flacko told him that "this guy ... approached him and asked him to take care of the witness in his case." (Martin Dep. at 39.) It was later determined that Flacko was referring to Willie and L.L.

2

Q:   Did you know Willie before you went to jail?

A:   No.

Q:   How long do you think you've know[n] Willie[?]

A:   Almost two and a half months.

Q:   At some point, did Willie pull you aside and ask
     you to do something for him?

A:   Yes.

Q:   What did he ask you to do?

A:   He told me to make sure his step-daughter won't
     come to court and testify against him.  He said he
     didn't care what I had to do to keep her from
     coming to court.

Q:   What did Willie tell you in reference to [L.L.], if
     you were to take care of her?

A:   He told me he would pay me a certain amount of
     money if I would take care of her.  He told me, "If
     the bitch don't come to court, they'll drop it.  No
     witness, no case."

Q:   In your opinion, was he asking you to kill her?

A:   Yes.  He told me he would give me a couple "Gs" if
     I would get rid of her.

....

Q:   Did Willie ever introduce you to Roxanne?

A:   By phone.

....

Q:   Was this by phone from the jail?

A:   Yes.

Q:   Who arranged for this phone contact with Roxanne?

A:   Willie.

3

....
Q:   Were you supposed to find a gun for Roxanne?

A:   Yes.

Q:   Was she hesitant to talk to you about the specifics
     of getting the gun for her?

A:   Yes.  She told me to come to her crib in person.

Q:   Do you know what she was going to use the gun for?

A:   No.

Q:   If you could not find a gun for her, what were you
     supposed to do?

A:   Take care of the daughter.

Q:   And by that, do you mean kill her?

A:   Yes.

Q:   So it was possible, in your understanding of the
     situation with Willie, that Roxanne could possibly
     use the gun to kill [L.L.]?

A:   Probably, yes.

....

Q:   Since you got out of jail, have you spoken with
     Willie on your home phone?

A:   Yes.

Q:   What did Willie ask you to do?

A:   To go to his house and meet his wife to give her a
     gun.

Q:   Have you done this?

A:   No.

Q:   Did you receive a phone call from Roxanne where she
     left you a message.

4

A:   Yes.

....

Q:   Did you make a return call to Roxanne?

A:   Yes, I did.

Q:   What did you tell her?

A:   I told her that I would accept [Willie's collect]
     calls and that as soon as I was ready with the
     thing, I would go to her house.  She said that was
     cool.  She said she would have the money in a
     couple more weeks.

Q:   When you say "thing" do you mean gun?

A:   Yes.

Q:   Did you believe that Roxanne and Willie were
     serious about having you kill [L.L.]?

A:   Yes.  I was positive they were very serious about
     it.  The way she sounded on the phone, she was real
     positive about it.

....

Q:   While you were still in jail, did Willie indicate
     to you how you were to identify [L.L.]?

A:   By a picture.  Willie told me to go pick a picture
     of [L.L.] up from Roxanne's house because she
     didn't want to bring it to my property.

Q:   At this point, have you received a picture of
     [L.L.]?

A:   No.

Q:   Just so we're clear, your understanding of this
     situation is that Willie and Roxanne are working
     together, through you, to kill [L.L.]?

A:   Yes.

(Clark. Aff. Ex. 2.)

In an attempt to corroborate Flacko's statement, the investigators obtained recordings of several phone conversations Willie had while in the ADC.  On April 24, 2004, Willie and Roxanne discussed various topics including their son, having someone install an alternator on Roxanne's car and whether Roxanne had met with Flacko.  Roxanne expressed hesitation about contacting Flacko but agreed to call him and tell him to accept Willie's calls from the ADC.  (Clark Aff. Ex. 14.)  The conversation then continued as follows:[2]

R:   Oh, you still want a peep show?

W:   Yep.

R:   I'll have to figure out what I'm going to do.

W:   That gives him a chance to go to daycare and play with [inaudible] and get to know 'em.

R:   Yeah, how am I going to do that?

W:   Just for one day.

R:   Yeah, but how am I going to do that?

W:   Drop him off.

R:   No, I'm talking about the other thing.

W:   I don't want to talk about that on the phone.

R:   I don't know how to do this shit, I don't do shit like that, so I don't know.  I've never done shit like that before.  I don't know.  Alright.

---

[2] There are certain discrepancies between the transcript of this conversation and what the court, after independently reviewing the recordings, determines was said.  The court notes the significant discrepancies below.

W:   Just-ah --

R:   Don't even talk about it.

W:   You got skirts at home?

R:   Yeah, I got skirts.

....

W:   Well wear one then.   This is the last weekend [inaudible] anyway.

R:   Yeah I know.

W:   The bullshit might gonna start.[3]

....

W:   I still want you to find out what the hell she did this week.  I didn't hear from her or nothing.[4]

R:   Mm-hmmm, alright.

W:   Find out what she did this week and let me know.[5]

R:   I will.

W:   Cuz all the bullshit like she gonna do everything in the trial, all that sh - everything should've been knocked down before she even went to trial. But this is gonna be -

R:   But I can't understand.

W:   This is just gonna be just a thing to see what they got, what they're working with.

R:   Yeah.

---

[3] The transcript indicates that "gonna start" is inaudible.

[4] The transcript indicates that "she" is inaudible and that "her" is "him."

[5] The transcript indicates that "she" is "he."

7

W:    This not gonna be the trial.[6]

....

R:    Well I don't know what the fuck's going on, you know.

W:    That's why I say keep - talk to the lawyer and see what else news they got for this week.

R:    Mm-hmmm.

W:    Call her tonight cuz it would be the best time to get hold to her.

R:    Yeah, cuz usually she ain't ... I don't know what she be doing really.

W:    Better talk to her tomorrow about it.

(Martin Aff. Ex. M-1; Clark Aff. Ex. 14.)

In two separate conversations on the morning of April 25, 2004, Roxanne told Willie that she had been unable to contact Flacko but had left a message indicating that Willie would be calling him. (Martin Aff. Exs. M-2 and M-3.) Later that evening, Roxanne told Willie that she had tried to call Flacko again but was told she had the wrong number. Willie confirmed the number and attempted to set up a three-way call with Flacko, at which time the call was cut-off. (Id. Ex. M-4.) Within minutes of the phone call

---

[6] The transcript indicates that Willie said "There's not gonna be a trial." Although difficult to decipher, the court determines that this interpretation best comports with the context of the discussion.

being cut-off, Willie called Roxanne again, and she informed him
that she had left Flacko a message.   The following exchange then
took place:

W:   Don't even worry about it no more.

R:   Okay.

W:   Unless he calls.

R:   Alright.

....

W:   'Cause he's probably thinking we called him for
     some bullshit.

R:   Oh, no.   I ain't trying to call nobody who, I
     wouldn't have called him if you wouldn't have asked
     me to.

W:   No, I'm talking about for that other stuff.

R:   Oh.

W:   But that ain't, I ain't even trying to do that.

(Id. Ex. M-5.)

The next day, Willie called Flacko and had an extensive
discussion with him about putting an alternator on Roxanne's car.
At one point the conversation strayed from talk of the alternator
when Flacko said "[H]ey Willie, I haven't found any of that shit,
you know what I'm saying?"   This led to the following exchange:

W:   Alright.   Ah, it's alright then.

F:   Um, but as soon as, um, your wife told me that, um,
     you know what I'm saying?   That

W:   Yeah, I know.

F:   you went through.  You know what I'm saying?

W:   Yeah.  Talk to her about it.

F:   For real?

W:   Yeah 'cuz I don't want to talk on the phone and
     worry about that.

(Id. Ex. M-6.)   After that the conversation focused on how to install the alternator and directions to Willie's house.   The conversation ended with Willie indicating that he wanted the alternator fixed as soon as possible and that he would sell a snowblower and lawnmower to Flacko for $80 in exchange for installing the alternator.

Willie and Flacko spoke again on April 27, 2004.  In that conversation, Flacko mentioned that he had spoken with Roxanne. Flacko then asked "remember what you told me to do?"  This exchange followed:

W:   Do what?

F:   Remember ... what you told me about the picture?

W:   Yeah, that's alright.

F:   That, that, that's really what you want me to do
     right?

W:   No.  I said that's alright.

....

W:   No.  I ain't even going that route.

F:   Huh?

W:   I ain't even going through that.

F:   Alright.  So ... what you want me to do then?

W:   Nothing.

....

F:   Do you want me to take ... what you told me to take
     over there?  That's cool.

W:   Did you talk to, ah, Roxanne today?

F:   Yeah.

W:   What'd she say?

F:   She said that she was going to talk to you about
     it.

W:   Well if you got one, yeah.

F:   I'm saying ... do you want me to do what you told
     me?  Because my home boy's coming from, you know,
     [inaudible].

W:   No.  I ain't ... messing around.

F:   You ain't?

W:   No.

F:   Alright.  So you just want me to forget what you
     told me?

W:   Yeah.  I, no, I was talking about that thing for
     Roxanne that she still want that don't she?

F:   Oh, so you, but you still want that thing?

W:   Yeah, if you can get one.

At this point, Willie asked what was wrong with Flacko's phone and
indicated several times that he was not trying to get into trouble.
Eventually Flacko asked what Willie wanted him to do, to which

11

Willie responded "Just forget it.  Just forget all about everything.  I, wait 'til I get out."  The conversation then proceeded as follows:

F:  I got the two that you lent me, remember?

W:  You got the what?

F:  What you told me to, what you told me to get [inaudible] to take to her house.

W:  You got it?

F:  Yeah.

W:  You got it now?

F:  Yeah.

W:  Take it over there now then.

....

F:  So what you want me to do?

W:  You know, you told her [inaudible] just call her right now and tell her, when you get off the phone. Call over there and tell her right now.  And, ah, y'all can make the deal on it.

....

W:  Just tell her you got it right now.

F:  Alright.

W:  But she ain't going to be able to give you the money right now.

F:  Alright.  But [inaudible] is one of my friends and shit.  If it was my shit, you know what I'm saying? But [inaudible] you know what I'm saying?  I can't do it.

W:  I'm saying it.  Shit, I know right now she don't have the money right now.

....

F:   How long you think she'll take to get it?

W:   She ain't going to have the money until ... the 7th.

....

F:   Alright Willie.  Well, I'll call her so, um, why don't you have her call me whenever she think she'll have the money.

W:   I'm just going to call her and tell her because, ah, she don't need all that bullshit.

F:   [inaudible]

W:   I'm just saying, she don't be in all that bullshit like that.

F:   Huh?

W:   She don't be in the bullshit like that.

F:   What do you mean?

W:   She don't be playing them kind of games.

F:   I know.  But, ah, you know, I know that.  I know [inaudible] she comes through with the money. [inaudible] put it down and pay me.

W:   Yeah because, ah, man, I'll talk to her because, ah, I ain't worried about that other shit no way.

F:   You ain't worried no more?

W:   Nope [inaudible] I ain't going to do it, I ain't going to do that like this.

....

W:   Let my lawyer deal with all that shit.

F:   Alright.  Well, it's cool.  I'll take that thing to her.

13

W:   So, you know, I know she a liar anyways.

F:   Huh?

W:   I know whatchacallit lying on me anyways so I ain't
     worrying about.

....

F:   Oh, and I'll talk to her and let her know what
     about that thing.

W:   Well you can call her right now and ask her if she
     still want it.  If she said no, don't worry about
     it.  But call her and ask her.

F:   Alright.  Well

W:   If she want it, you can sell her one.  But if she
     don't want it, then forget it.

....

W:   Yeah, because I'm trying to get out of here May
     4th.  But all that bullshit, I ain't trying do that
     [inaudible] all that all bullshit, dumb shit.   I
     ain't trying to, ah, I don't believe in hurting
     nobody.  I don't believe in that shit.

F:   Alright Willie.  You know -

W:   'Cuz what [L.L.] did to me, ah, believe me God will
     punish her.

F:   Yeah.

W:   For, for setting me up because she set me up to get
     me out the house.  And everybody know it.

F:   No, you know what?  I asked her if you told me,
     remember what to do, and shit.  And I was like
     [inaudible].

W:   No I didn't.  Like I said, ah, when one person,
     when a person do a person wrong, some day they get
     caught up in some bullshit, she'll do something....
     They gonna catch her ass.  She going be going
     through some times as soon as she get caught up.

14

(<u>Id.</u> Ex. M-7.)   The conversation then ended with Willie telling Flacko to call Roxanne.   Fifteen minutes later, Willie had the following conversation with Roxanne:

W:   Flacko call you?

R:   Yeah.

....

R:   [D]id you mention something about a picture of [L.L.]?

....

W:   [L]isten I just told him, nope, I'm not playing that dumb shit.

R:   Yeah, okay.

W:   I told him that, I don't know what he trying to pull, I don't know if he's trying to set me up or what.

R:   No, I had to ask you because he brought it up.

W:   No, I not even playing the dumb shit.

R:   Okay.

W:   'Cause I don't know what they up to.

R:   Okay.

W:   I ain't messing with shit.

....

W:   Flacko [inaudible] to set me up.

R:   Nope.

W:   For no bullshit.   I don't know what's going on.

R:   Uh-huh.

W:   They might be working.  They might be his ticket to
     get out of here.

R:   Oh, okay.

W:   So I ain't on no bullshit.

....

R:   That's all I needed to know.

W:   See, they probably trying to pull that shit.

R:   Well, you need to have him stop calling here then.

....

W:   But did he call you and tell you hey, bringing you
     the shit?

R:   He didn't say nothing about that.  He said, all he
     said is he's still going to do that and that for
     you to call him on Thursday ....  And I didn't say
     nothing.  I just said I had to talk to you....

W:   Well, that's all on Flacko, that's not on me.

R:   Oh.

W:   'Cause I told him you still want that piece that ah
     thing you going to buy the thing from him.

R:   Right.

W:   That's why I told him to call you and say he's had
     it.  I said call over there, I just talked to him.
     ...  I told him to call you and tell you you got
     his thing and work something out with him.  I told
     him you ain't gonna have no money until the 7th of
     next month.

R:   Alright.

W:   He didn't mention nothing about that?

R:   No.

....

16

W:    You know what?

R:    What?

W:    Call him back.

R:    Uh-huh.

W:    [T]ell him I said never mind and what's up with the
      bullshit....  Tell him I said that it's all right
      and this shit is not going down that way, whatever,
      ya know.

....

R:    Did you want me to tell him I want it or I don't?

W:    What, you want it?

R:    I don't have time for bullshit; if there's bullshit
      in the picture I don't have time for.

W:    Well, tell him that.

R:    Okay.

W:    And I'll call you right back and tell him nope,
      cause then you tell him don't keep calling there.
      If he's calling with bullshit, don't call over
      there.

R:    Alright.

(Id. Ex. M-8.)  Ten minutes later Willie and Roxanne had another

conversation in which Roxanne mentioned that she had just left a

message for Flacko.[7]  Willie and Roxanne continued talking about

---

[7] Roxanne left the following message:
Yes, Flacko, um, my name is Roxanne Richardson....  My
husband said he don't know what's going on, but um, as
far as all that other bullshit about my daughter, but um,
I want to get that piece but I don't wanna no bullshit
and I don't need to keep calling your house and what you
do, if you got the shit, fine, and then we'll go from
                                        (continued...)

Flacko, hypothesizing that he was trying to get a deal by setting Willie up.[8]   The following exchange occurred after Roxanne indicated she did not want to deal with Flacko:

> W:   You can just tell him no if anyone of them come around this ah -
>
> R:   I know what to do.
>
> W:   You see, you know who he is; he looks like a white boy, only Puerto Rican.
>
> R:   Okay.
>
> W:   He give you a holler at the door and you don't deal with it or whatever.
>
> ....
>
> W:   You know what to do.
>
> R:   Yup, I know what to do (yawning).
>
> W:   Call the police and get them right out the yard.
>
> ....
>
> W:   [I] don't want them coming around.

(Id. Ex. M-9.)  Willie then suggested that Flacko might have taped Roxanne's conversation with Flacko.  Roxanne responded that she was

---

[7](...continued)
there, but otherwise I don't want no steady phone calls and I don't want, um, no bullshit cuz I'm not gonna deal with it cuz I can't deal with no bullshit.  Bye.

(Id. Ex. M-10.)

[8]  The court notes that the recording differs from the transcript in several places.  For example, page five of the transcript has Willie saying "He probably to switch from under it." Willie actually says "He probably trying to snitch on somebody." In addition to this example, there were other minor discrepancies.

18

not "going to deal with this."   The conversation continued as

follows:

> W:   No, just tell him no, don't even fuck around.
>
> R:   Alright.
>
> W:   'Cause they up to some bullshit and the only
>       problem is trying to get the shit started.
>
> R:   Uh-huh.
>
> W:   'Cause I'm getting close to my court date.
>
> R:   Yeah, end of next month.
>
> W:   Yeah, they probably trying to get something on me
>       so they can kind of win this court case.
>
> ....
>
> W:   'Cause they try anything.   I'm getting closer.
>       They'll try to use some of these motherfuckers to
>       do shit to set me up.[9]

(Id.) Willie then indicated that he would get Flacko's number from

Roxanne the following day but said "I don't think I'm going to call

it no way.  I think I'm going to leave it."   The discussion about

Flacko ended with the following:

> R:   [I] had wrote [the phone number] down cause, I
>       didn't know, like I said, I don't know what's going
>       on.
>
> ....
>
> W:   There's nothing been going on.   What you said you
>       wanted that?
>
> R:   Yeah, that was supposed to be it.

_____

     [9] The transcript has Willie saying "'Cause they try anything,
I'm getting closer (inaudible) to do shit to set me up."

```
W:   Yeah.

R:   Ya know.

W:   He would talk about [L.L.] in here but I told him
     'cause we talked in here seeing how she look.

R:   Uh-huh.

W:   And I said well, you had a picture at home how she
     looks.

R:   Uh-huh.

W:   That was it.  There was no big deal about that, not
     to me.  I don't know what the fuck they up to.

R:   Me neither.... [Y]ou know me.

W:   They trying to make something out of nothing.
```

(<u>Id.</u>)[10]

At the direction of the detectives, Flacko met with Roxanne at

her house on April 29, 2004, while wearing a wire.  The following

conversation ensued:

```
F:   I don't get what you trying to say.  I mean
     Willie's telling me to do some shit.  And, and you
     telling me another thing....

R:   No.  I, I wanted to get the stuff but I don't want
     to deal as far as what Willie said about a picture
     of [L.L.]  I'm not going there.

....

R:   I'm not dealing with that.  I, I can't deal with
     that.  Because that's too much for me to handle,
     alright.  If you want to, if that's what we need to
```

---

[10] Kritzeck also listened to conversations between Roxanne and
Willie that took place on April 29 and 30.  Those conversations,
however, are not in the record because Willie and Roxanne did not
discuss Flacko.  (Kritzeck Aff. ¶ 7.)

deal with. Ah, 'cuz I'm not going to do that. Um, and I, I can't, um, all this stuff, I want to do it but I don't, I don't want [inaudible]. I, I've had so much, so many things going on with my husband, me personally, and I, I just can't deal with a lot of drama. And that's all I was just trying to say.

F:  Yeah, yeah, he told me ... make sure that your bitch didn't come up to court 'cuz I thought if she didn't come to court they can't charge me.

R:  Right. Well, no. Willie needs, I, well, let me talk to him. Don't let him get involved in that. They'll deal with that. I'll help Willie. Willie is my husband. He's my responsibility so I'll deal with him.

F:  Yeah but I, I just try to help a brother, you know what I'm saying?

R:  Yeah, I know. But, um, it's just that he, we'll, we'll deal with it. I can't, I just got a lot of information today and I've been dealing with his lawyer so.

F:  So, another thing is I can't bring you the heat, you know what I'm saying? If you ain't got no money. You know what I'm saying?

R:  Oh, so what, no. I understand that. That's fine.

....

R:  I'm going to get that money. I don't know. I got to be in court next week. So probably after the 7th if they pay me the money they owe me.

....

F:  So you gonna call me as soon as you get that? Because I can bring that shit to you. You know what I'm saying?

R:  Okay. Yeah. As soon as I get the money.

....

21

F:     Because I was confused what he told me.... Get rid of, get rid of this bitch.  You know what I'm saying?  And I had my home boy come, you know what I'm saying?

R:     Yeah, well Willie shouldn't even of went there because, um, even though she's my daughter and I don't care for her, you know this, that is not the way to take care of things.  You know, it's not the way I deal on situations so that's - he should have known better.

F:     I feel for you. [inaudible] make sure she come up in court.

R:     Oh, I ain't really worried about it because if that's the case, I could did it back in March myself.  You know?  And I ain't tripping, you know, I know my husband.  I know my husband [inaudible]

F:     You told me just go pick up [L.L.] because I remember you told, you remember I asked you for to get me the picture.  Remember?

R:     Uh-huh.

F:     And I told you, um, so, I, I was thinking, that you know, that I was coming here to get the picture.

R:     No, ... I threw all my daughter's pictures away.

F:     I understand.

R:     See she did me wrong....  I guess the only thing we really need to do is when I get the money, I'll get that from you.

(Id. Ex. M-11.)  At this point, Roxanne told Flacko to make sure that the gun she was planning on purchasing was something she could handle, but one that would "make damage."  Flacko later indicated that he would sell her the gun without bullets and would bring her the bullets later.  Roxanne responded that she would not do anything stupid and that she "don't play games."  Just before the

conversation ended, Roxanne stated: "I don't hurt nobody who hasn't hurt me.  You know, if somebody hurt me, then it's different.  But if, um, if you're trying to help me out, you know, I can give the utmost respect."  (<u>Id.</u>)

Roxanne's next interaction with Flacko was another meeting on May 6, 2004, initiated by Flacko at the direction of the detectives.  At that meeting, Flacko indicated that he had a gun that Roxanne would like.  Roxanne, however, told him that she had not been to court and did not have any money with which to purchase the gun.  Upon hearing this, Flacko cut the price for the gun in half, and after Roxanne again told him she did not have any money, suggested making a deal with the lawnmower and snowblower; but Roxanne had already sold those to her cousin.  The conversation ended with Roxanne reiterating that she would not know until the following Friday whether she would have money with which to buy the gun, and that if the court awarded her any money, it would "be a week before it get here."  (<u>Id.</u> Ex. M-12.)

Later that evening, Burchett, along with another detective, returned to Roxanne's home to arrest her.  This conversation was also recorded.  (Beitz Aff. Ex. K.)  After reminding Roxanne that her phone calls with Willie were monitored, the following exchange took place:

B:     Well, you guys kind of quit talking on the phone
       after you talked about killing [L.L.]

R:   I'm not - man, I am not gonna kill my daughter.  I, I wouldn't do that.  I'm not that kind of person....  I, I'm hostile.  I feel that way, but I'm not going to do it.

B:   Willie was conspiring with you to hire a guy to kill her.

R:   Oh, no, no, no, no.  I'm not gonna do that.

B:   Well, this is the way it is here, Roxanne.  We got, we got our side of the story and you got your side of the story.

R:   Well I know one thing, I'm not gonna kill my daughter.  The last time I seen my daughter was on her birthday.  I ain't seen her since.

B:   I think I can almost quote.  One of your conversations was, "I think he's working with the police.  We'll take care of it another way."

R:   Well that, that ain't me.

B:   No, that was your words.

....

R:   Well, I'm not gonna do nothing stupid.  I ain't never been arrested.  I ain't never been in trouble, and I -

B:   Well, you are in trouble now and we are going to place you under arrest at this particular point in time.

(Id.)  Burchett then arrested Roxanne without obtaining an arrest

warrant.  Roxanne was detained pursuant to an "Authority to Detain"

signed by Burchett indicating a charge of first degree conspiracy

to commit murder.

On May 7, 2004, Burchett and Kritzeck each filed investigative

reports to support Roxanne's arrest.  After indicating that Willie

gave Roxanne Flacko's phone number and told her to tell Flacko to accept Willie's calls, Burchett's report provided the following interpretation of the phone calls:

1.  Willie instructs Roxanne to find out where Roxanne's daughter, [L.L.], is living. Roxanne asks, "How am I gonna do that other thing Willie?" and Willie states, "Don't talk about that on the phone," referring to the murder of [L.L.]

2.  Willie states, "This is my last weekend anyway. The BS is about to start."

3.  Willie again instructs Roxanne to "Find out where the hell she's living," meaning [L.L.], "this week." Willie states, "Everything should be knocked down before this thing even went to trial. But they got who they're gonna be working with," meaning the prosecution. Willie states, "There won't be a trial," meaning if [L.L.] disappears. Willie tells Roxanne that the state is representing [L.L.] Roxanne tells Willie to have Flacko call her at night cuz it's the best time to get a hold of her.

4.  On 4/25/04, at approximately 7:57 PM, Willie calls Roxanne again and gets [Flacko's] phone number from another inmate to verify the number that Willie had given to Roxanne. Roxanne thought she had gotten the wrong number, as she had been unable to contact [Flacko]. Roxanne tells Willie to breath heavy and she attempts a three way [call] and they are disconnected.

5.  On 4/25/04, at approximately 8:03 PM, Roxanne tells Willie that she left a message on [Flacko's] answering machine.

6.  On 4/26/04, at 6:41 PM, Willie ... called [Flacko] at [Flacko's] residence. [Flacko] tells Willie he doesn't have a gun yet and Willie instructs [Flacko] to talk to Roxanne about it. Willie instructs [Flacko], "I don't want to talk on the phone," and gives [Flacko his] address.

(Clark Aff. Ex. 9.)

Kritzeck filed two investigative reports.  The first report focused on the phone calls and indicated at the outset that Willie and Roxanne were working with Flacko to have L.L. murdered before Willie's trial.  The report then continued as follows:

> 2.  It became very apparent, while monitoring the[] recorded telephone calls, that Willie Richardson was instructing [Roxanne] to determine [L.L.'s] whereabouts ....   There were several telephone calls referencing Willie instructing Roxanne to find out where [L.L.] is now living and instructing her to get photographs of [L.L.] to show or give to Flacko.
>
> 3.  One telephone call in particular on 4/27/04 ... Flacko tells Willie that he had acquired a handgun. Willie instructs Flacko to take this handgun to his wife, Roxanne, and sell it to her.   While Willie was saying this, Flacko's telephone was receiving some interference, at which time Willie asked Flacko what was wrong with his telephone. Immediately Willie recanted what he had told Flacko previously, and stated, "Forget about everything. Don't worry about it.   I'll take care of it myself."
>
> 4.  During several of these telephone calls ... both Willie and Roxanne referenced the fact that these telephone calls are recorded and to be careful what they say.   Willie was convinced that Flacko was working with the police because of the way he was released from jail.

....

(Id. Ex. 4.)

Kritzeck's second report focused on the April 29 meeting between Flacko and Roxanne.[11]   Kritzeck described that meeting as follows:

> [Flacko] made reference to a conspiracy between he and Willie Richardson and Roxanne Richardson to have Roxanne Richardson's daughter, [L.L.], the victim of a rape by Willie Richardson killed.   During this conversation between [Flacko] and Roxanne, Roxanne informs [Flacko] to disregard or forget about what he and Willie had talked about in jail and that she would take care of the problem.   Roxanne still wanted [Flacko] to acquire a handgun for her and told [Flacko] that she wanted a gun that she could handle, but yet a gun that could cause some damage.   Roxanne informed [Flacko] that she, at this time, did not have the funds to pay for a gun, but following a court appearance on 5/7/04, she would be receiving money to pay for this firearm.   Roxanne Richardson stated that she would contact [Flacko] when she had the funds to pay for this firearm.   For complete details pertaining to what was said during this meeting, see attached recording.

(Id. Ex. 3.)

The state did not file a criminal complaint immediately after Roxanne's initial arrest, and she was released on May 8, 2004.   On May 13, 2004, however, a state prosecutor drafted a complaint charging Willie and Roxanne with conspiracy to commit aggravated first degree witness tampering.   On May 14, 2004, defendant Detective Todd Turpitt ("Turpitt") served as the complaining witness in front of a state court judge, who signed the complaint after finding that it stated probable cause.   As a result, Roxanne

---

[11] The report indicates that the meeting took place on May 6, 2004.   The report's narrative, however, makes clear that Kritzeck is referencing the earlier meeting.

27

was arrested and detained on May 14, 2004. Roxanne challenged probable cause on August 25, 2004, and at a hearing on October 22, 2004, a different state court judge ordered Roxanne's immediate release for lack of probable cause.

Roxanne brought the current action on October 20, 2006, and her amended complaint alleges various claims under 42 U.S.C. § 1983 and a state law claim for malicious prosecution.[12] Defendants now move for summary judgment on all claims.

## DISCUSSION

**I.   Summary Judgment Standard**

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A fact is material only when its resolution affects the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. See id. at 252.

_____

[12] Roxanne's counsel voluntarily dismissed her false imprisonment claim.

On a motion for summary judgment, all evidence and inferences are to be viewed in a light most favorable to the nonmoving party. See id. at 255. The nonmoving party, however, may not rest upon mere denials or allegations in the pleadings but must set forth specific facts sufficient to raise a genuine issue for trial. See Celotex, 477 U.S. at 324. Moreover, if a plaintiff cannot support each essential element of his claim, summary judgment must be granted because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial. Id. at 322-23.

## II.  Section 1983 Claims

A claim pursuant to § 1983 requires a plaintiff to establish the deprivation of a right secured by the Constitution or laws of the United States that was caused by a person acting under the color of state law. Tipler v. Douglas County, 482 F.3d 1023, 1027 (8th Cir. 2007) (citations omitted). Roxanne asserts that she was twice arrested without probable cause in violation of the Fourth Amendment and that she was the subject of a reckless investigation in violation of her right to substantive due process protected by the Fourteenth Amendment.[13] Roxanne further contends that defendant

---

[13] Roxanne also asserts that the detective defendants engaged in a conspiracy to violate her constitutional rights. However, no facts support an agreement to violate Roxanne's constitutional rights. Reasonover v. St. Louis County, 447 F.3d 569, 582 (8th Cir. 2006) ("The officers may have jointly pursued their investigation based on a belief [plaintiff] was guilty, but this (continued...)

Hennepin County's failure to train its detectives was the moving force behind her alleged constitutional violations.[14]

## A.   Individual Liability

The detective defendants maintain that they are entitled to qualified immunity.  Qualified immunity provides protection from civil liability to government agents who perform discretionary functions, so long as the challenged actions are objectively reasonable in light of clearly established legal principles.  See Anderson v. Creighton, 483 U.S. 635, 638 (1987).  Qualified immunity is a question of law that the court determines as early as possible so as to shield appropriate officials from suit.  See Gainor v. Rogers, 973 F.2d 1379, 1382-83 (8th Cir. 1992).  In evaluating a claim of qualified immunity, the initial inquiry is whether, "the facts alleged show the officer's conduct violated a constitutional right[.]"  Saucier v. Katz, 533 U.S. 194, 201 (2001); Craighead v. Lee, 399 F.3d 954, 961 (8th Cir. 2005).  If the facts alleged by plaintiff do not establish a violation of a constitutional right by an officer, no further inquiry is necessary and qualified immunity is warranted.  Saucier, 533 U.S. at 201.

---

[13](...continued)
does not constitute an unlawful conspiracy."). Therefore, summary judgment is appropriate to the extent Roxanne seeks conspiratorial liability.

[14] Plaintiff did not pursue this claim in her memorandum in opposition to defendants' motion for summary judgment. Nevertheless, at oral argument, plaintiff's counsel indicated her desire to maintain the claim.

However, if the facts do allege a constitutional violation, the court must determine whether the right alleged to be violated was clearly established so that a reasonable officer would understand that the conduct he engaged in was unlawful. See id.; Wilson v. Layne, 526 U.S. 603, 614-15 (1999). In other words, "the unlawfulness must be apparent" in light of pre-existing law. Anderson, 483 U.S. at 640. This second inquiry is fact intensive and "undertaken in light of the specific context of the case." Saucier, 533 U.S. at 201. The court applies the doctrine of qualified immunity in a manner that "'gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law.'" Walker v. City of Pine Bluff, 414 F.3d 989, 992 (8th Cir. 2005) (quoting Hunter v. Bryant, 502 U.S. 224, 229 (1991)).

### 1.   Fourth Amendment

#### a.   Deprivation of Constitutional Right

A warrantless arrest violates the Fourth Amendment unless it is supported by probable cause. Amrine v. Brooks, 522 F.3d 823, 832 (8th Cir. 2008). "Because the qualified immunity privilege extends to a police officer who is wrong, so long as he is reasonable, the governing standard for a Fourth Amendment unlawful arrest claim is not probable cause in fact but arguable probable cause." Walker, 414 F.3d at 992 (citation and quotation omitted). "Probable cause exists when the totality of the circumstances shows

that a prudent person would believe that the arrestee has committed a crime." <u>Amrine</u>, 522 F.3d at 832.  In assessing probable cause, a court looks at "the objective facts available to the officers at the time of the arrest," <u>Sheets v. Butera</u>, 389 F.3d 772, 777 (8th Cir. 2004), and gives the officers "substantial latitude in interpreting and drawing inferences from factual circumstances," <u>Kuehl v. Burtis</u>, 173 F.3d 646, 650 (8th Cir. 1999) (citation and quotation omitted).  Such latitude, however, is not unlimited.  An "officer contemplating an arrest is not free to disregard plainly exculpatory evidence, even if substantial inculpatory evidence (standing by itself) suggests that probable cause exists." <u>Id.</u>; <u>see also</u> <u>Anderson v. Cass County, Mo.</u>, 367 F.3d 741, 747 (8th Cir. 2004).  Further, absent exigent circumstances, officers are required to conduct "a reasonably thorough investigation prior to arresting a suspect." <u>Kuehl</u>, 173 F.3d at 650.  This does not mean officers must conduct a mini-trial, "but probable cause does not exist when a 'minimal further investigation' would have exonerated the suspect." <u>Id.</u>; <u>see also</u> <u>Amrine</u>, 522 F.3d at 832.

Roxanne argues that the detectives are not entitled to qualified immunity because she was arrested without arguable probable cause to support a conspiracy to murder L.L. or otherwise prevent L.L. from appearing in court.[15]  In Minnesota, the "crime of

---

[15] The "Authority to Detain" submitted by Burchett cited only the Minnesota conspiracy statute, Minnesota Statutes § 609.175, but

(continued...)

conspiracy requires (1) an agreement between two or more people to commit a crime and (2) an overt act in furtherance of the conspiracy." Ramsey County v. Stewart, 643 N.W.2d 281, 297 (Minn. 2002) (citing Minn. Stat. § 609.175, subdiv. 2). An agreement may be established by circumstantial evidence, State v. Vereb, 643 N.W.2d 342, 348 (Minn. Ct. App. 2002), and "the slightest action on the part of a conspirator" can be an overt act, Stewart, 643 N.W.2d at 297 (citing State v. St. Christopher, 232 N.W.2d 798, 804 (Minn. 1975)). Moreover, a "conscious and intentional purpose to break the law is an essential element of the crime of conspiracy." State v. Jacobson, 697 N.W.2d 610, 615 (Minn. 2005) (citation and quotation omitted). Defendants argue that Flacko's April 27 statement to Burchett and Martin established arguable probable cause that Roxanne and Willie agreed to commit a crime. Further, defendants maintain that Roxanne committed an overt act in furtherance of that agreement

---

[15](...continued)
indicated Roxanne had committed first degree conspiracy to commit murder. The complaint prepared by the state prosecutor cited § 609.175 in addition to § 609.498, subdiv. 1b(a)(1), which provides:

> A person is guilty of aggravated first-degree witness tampering if the person causes or, by means of an implicit or explicit credible threat, threatens to cause great bodily harm or death to another in the course of ... preventing or dissuading or attempting to prevent or dissuade a person who is or may become a witness from attending or testifying at any criminal trial or proceeding.

by contacting Flacko at Willie's behest, facilitating dialogue between Willie and Flacko and meeting with Flacko about obtaining a gun.

In certain circumstances, Flacko's statement alone may have supported probable cause of an agreement between Willie and Roxanne. See United States v. Taylor, 519 F.3d 832, 834 (8th Cir. 2008) ("When the arrest is based on information provided by an informant, that information may be sufficiently reliable to support a probable cause finding if the person providing the information has a track record of supplying reliable information, or if it is corroborated by independent evidence." (citations and quotation omitted)).  The leading questions by the detectives and an objective review of the telephone conversations and meetings, however, undermine the statement's reliability insofar as it relates to an agreement between Willie and Roxanne to prevent L.L. from testifying.

The evidence available to the officers at the time of Roxanne's arrests - including Flacko's statement, the phone conversations and Flacko's meetings with Roxanne - reasonably establish that while incarcerated together Flacko and Willie had a nefarious conversation or agreement about preventing L.L. from testifying at Willie's trial, and that Roxanne was interested in obtaining a gun from Flacko and had conversations with him to that effect.  The issue is whether these two conclusions, when considered in light of the other evidence, establish arguable probable cause that Roxanne was a party

34

to an agreement to prevent L.L. from testifying at Willie's trial. The court determines that they do not.

First, no direct evidence establishes an agreement between Willie and Roxanne to kill L.L. Burchett's report notes several statements by Willie and Roxanne ostensibly evidencing such an agreement. When read in context, however, none of those statements supports the meaning attributed to them by Burchett. For example, Burchett's report states that Roxanne was referring to murdering L.L. when she asked Willie on April 24, 2004, "How am I gonna do that other thing?" Rather than referring to murdering L.L., the portions of the conversation omitted from Burchett's report make clear that Roxanne is referring to a peep show. Similarly, Burchett's report indicates that Willie told Roxanne "there won't be a trial" if L.L. was not available to testify. Read in context, however, Willie was attempting to explain to Roxanne his understanding of the criminal process by telling her that the next proceeding is "not gonna be the trial." Burchett also noted that Roxanne told Willie to have Flacko call her at night. Again, this statement misconstrues the conversation. Rather than Roxanne giving Willie instructions about Flacko, Willie was telling Roxanne to call his lawyer that night because it was the best time to get hold of her. In short, the quotes used by Burchett as direct evidence of an agreement between Willie and Roxanne are inapposite.

Second, in her conversations with Willie, Roxanne consistently expressed ignorance of any agreement between Willie and Flacko with respect to L.L.   Roxanne expressed initial reservations about calling Flacko and told Willie that she would not have called Flacko if Willie had not asked her to do so.   Further, Roxanne's April 27 conversation with Willie suggests that Roxanne did not know of any discussions between Willie and Flacko with respect to her providing Flacko with a picture of L.L. until after she spoke with Flacko earlier that day.

Third, in the police-initiated meetings between Roxanne and Flacko, Roxanne consistently rebuked Flacko's overtures about getting a picture of L.L. and making sure that L.L. was unavailable to testify at Willie's trial.   Roxanne further expressed disapproval of any conversations Willie had about keeping L.L. from testifying. And although Roxanne showed interest in buying a gun from Flacko, she also indicated that she did not have the money to buy a gun, exhibited no concern about not being able to obtain one and never alluded to her reason for acquiring a gun.

In sum, Flacko's statement provides the sole basis for establishing arguable probable cause.   In that statement, however, Flacko initially indicated that he did not know why Roxanne wanted the gun.   Only after being asked leading questions did Flacko indicate that Roxanne wanted the gun to kill L.L.   In the absence of evidence corroborating Flacko's statement, and in light of

36

Roxanne's consistent statements indicating that she was not involved in a conspiracy to prevent L.L. from testifying, the court cannot determine as a matter of law that arguable probable cause existed to arrest Roxanne for conspiracy.[16]  The remaining issues are which of the detective defendants may potentially be exposed to liability and for which arrests.  See Wilson v. Northcutt, 441 F.3d 586, 591 (8th Cir. 2006) ("Liability for damages for a federal constitutional tort is personal, so each defendant's conduct must be independently assessed." (citation omitted)).

### b.   Causation

A defendant is liable for a constitutional violation only if his actions caused the violation.  See Morton v. Becker, 793 F.2d 185, 187 (8th Cir. 1986) ("Causation is an essential element of a section 1983 cause of action.").  A court looks to the common law to assess causation in § 1983 actions.  Doran v. Eckold, 362 F.3d 1047, 1050 (8th Cir. 2004), rev'd on other grounds en banc, 409 F.3d 958 (8th Cir. 2005).  "Minnesota applies the substantial factor test for causation." George v. Estate of Baker, 724 N.W.2d 1, 10 (Minn. 2006).  In other words, a defendant's action proximately caused the

---

[16] Defendants also maintain the existence of arguable probable cause based upon the prosecutor reaching the same conclusion after an independent review of the evidence and the state district court judge finding probable cause and issuing the arrest warrant resulting in Roxanne's second arrest.  As discussed below, however, the language in the complaint comes nearly verbatim from the investigative reports, calling into question the independence of the prosecutor's review.

harm "if the act was a substantial factor in the harm's occurrence." Id. However, the chain of causation can be broken by a "superseding, intervening event." Wartnick v. Moss & Barnett, 490 N.W.2d 108, 113 (Minn. 1992). Proximate cause is a fact question for the jury unless "reasonable minds can arrive at only one conclusion." Lubbers v. Anderson, 539 N.W.2d 398, 402 (Minn. 1995). Roxanne argues that Martin, Burchett, Kritzeck and Turpitt caused both of her arrests.

### i.   First Arrest

The record establishes that Burchett not only arrested Roxanne but also participated substantially in the investigation that led to her arrest and the decision to arrest her. Therefore, Burchett's actions were a substantial factor in Roxanne's first arrest, and he is not entitled to qualified immunity for that arrest. The record also establishes that Turpitt was not involved in the investigation leading to Roxanne's first arrest or the decision to arrest her. Therefore, Turpitt's actions were not a substantial factor in Roxanne's first arrest, and he is entitled to qualified immunity for that arrest. The remaining issues are whether Kritzeck's and Martin's actions proximately caused Roxanne's first arrest. See Jordan v. Mosley, 487 F.3d 1350, 1354 (11th Cir. 2007) ("[A] non-arresting officer who instigates or causes an unlawful arrest can still be liable under the Fourth Amendment." (citing Rodriquez v. Ritchey, 539 F.2d 394, 400 (5th Cir. 1976)); accord New v. Fleming,

38

170 Fed. Appx. 298, 302 (5th Cir. 2006) ("[I]nvestigating officers may be subject to liability for unlawful arrest even where they did not participate in the actual arrest.").

Kritzeck was assigned to investigate the alleged conspiracy between Roxanne and Willie, he participated substantially in the investigation, he was present at Roxanne's arrest and he filed two investigative reports after the arrest. In addition, the record is ambiguous as to whether Kritzeck was involved in deciding to arrest Roxanne. (See Kritzeck Dep. at 32; Burchett Dep. at 34; Martin Dep. at 95.) In light of this evidence, the court determines that a fact issue remains as to whether Kritzeck's actions were a substantial factor in Roxanne's first arrest, and summary judgment is not warranted.

Martin initially interviewed Flacko, questioned him with Burchett and participated in the April 29 surveillance. Martin, however, did not participate in the decision to arrest Roxanne or the May 6 surveillance and arrest. Moreover, Martin did not file an investigative report after Roxanne's arrest. Absent involvement in the decision to arrest Roxanne or her actual arrest, the court determines that Martin's actions, as a matter of law, did not proximately cause Roxanne's arrest. Cf. New, 170 Fed. Appx. at 302 (significant that non-arresting officer participated in meeting determining probable cause existed to arrest). Therefore, the court grants summary judgment as to Martin on this claim.

39

### ii.  Second Arrest

### (A)  Burchett and Kritzeck

Burchett and Kritzeck argue that the state prosecutor's independent action of drafting a complaint and causing it to be filed interrupts the chain of causation and precludes their liability for Roxanne's second arrest.[17]  "[T]here is a great deal of tension in the caselaw about when official conduct counts as an intervening cause."  Hector v. Watt, 235 F.3d 154, 161 (3d Cir. 2000); see also Murray v. Earle, 405 F.3d 278, 292 n.51 (5th Cir. 2005) (gathering cases).  The Eighth Circuit has held that "absent any specific allegations, such as the presentation of false evidence or the withholding of evidence, [a] grand jury indictment breaks any chain of causation."  Ames v. United States, 600 F.2d 183, 185 (8th Cir. 1979) (citations omitted).  In a closely analogous circumstance, other circuits have held that a prosecutor's independent review of the evidence and filing of a criminal complaint interrupts the causal chain.  See, e.g., Hector, 235 F.3d at 163 (gathering cases and noting "contradictory jurisprudence" on the issue); Smiddy v. Varney, 665 F.2d 261, 266 (9th Cir. 1981), modified by, 803 F.2d 1469 (9th Cir. 1986).  The court finds the

---

[17] Consistent with the court's conclusion that Martin did not cause Roxanne's first arrest, the court also determines that Martin did not cause Roxanne's second arrest.  Further, because Turpitt was not involved in the initial arrest, there is no causal chain for the prosecutor's action to interrupt.  Rather, the court addresses Roxanne's claim against Turpitt below.

Ninth Circuit's "rebuttable-presumption-based approach" persuasive. See <u>Beck v. City of Upland</u>, 527 F.3d 853, 862 (9th Cir. 2008).

The filing of a criminal complaint by a prosecutor creates an evidentiary presumption that the prosecutor "exercised independent judgment in determining that probable cause for an accused's arrest existed, thereby breaking the chain of causation between an arrest and prosecution and immunizing investigating officers from damages suffered after the complaint was filed." <u>Id.</u> (citations and quotations omitted). A plaintiff may rebut this presumption by showing "that the independence of the prosecutor's judgment has been compromised." <u>Id.</u> One circumstance in which the prosecutor's judgment has been compromised is where "the prosecutor relied on the police investigation and arrest when [s]he filed the complaint instead of making an independent judgment on the existence of probable cause for arrest." <u>Id.</u>

In this case, the state prosecutor is entitled to a presumption that she exercised independent judgment in determining probable cause existed to charge Roxanne with conspiracy to commit aggravated first degree witness tampering. The prosecutor also submitted an affidavit stating that she was not influenced or pressured by the investigating officers in her probable cause determination and that she decided to file charges only after independently reviewing the investigative reports, listening to the phone conversations and reviewing the audio from Flacko's meetings with Roxanne. (Holton-

41

Dimick Aff. ¶¶ 3, 4.)  The complaint's language, however, is taken almost verbatim from Burchett's and Kritzeck's investigative reports.[18]  Indeed, the complaint even mistakenly cites the meeting

_____

[18] The complaint contained the following factual narrative:

On or about April 24, 2004, [Willie] approached [Flacko] and asked him to make sure [L.L.] did not come to court and testify against him.  [Flacko] stated that [Willie] told him that he did not care what he had to do to keep L.L. from coming to court.  [Flacko] stated that [Willie] offered to pay him a couple "G's" if he would get rid of her.

That same day, [Willie] contacted [Roxanne] and gave her [Flacko's] phone number.  During the conversation, [Willie] instructs [Roxanne] to find out where L.L. was living.  He states at this time that "everything should be knocked down before this thing even went to trial" and "there won't be a trial."

On April 25, 2004, [Roxanne] calls [Willie] and tells him she left a message on [Flacko's] answering machine.

On April 26, 2004, [Willie] called [Flacko] at [Flacko's] residence. [Flacko] tells [Willie] that he does not have a gun yet and [Willie] instructs [Flacko] to talk to [Roxanne] about it.  [Willie] instructs [Flacko], "I don't want to talk on the phone" and gives [Flacko] the address where he and [Roxanne] live.

On April 27, 2004, there is a phone conversation between [Willie] and [Flacko].  [Flacko] tells [Willie] that he had acquired a handgun.  [Willie] instructs [Flacko] to take this handgun to [Roxanne] and sell it to her.  There was some interference on the phone, at which time [Willie] asked [Flacko] what was wrong with his telephone.  Immediately [Willie] told [Flacko], "forget about everything.  Don't worry about it.  I'll take care of it myself."

On May 6, 2004, [Flacko] met with [Roxanne] at her home. ... [Flacko] makes reference to the plan between [Willie], himself and [Roxanne] to have L.L. killed.
(continued...)

42

between Roxanne and Flacko identified in Kritzeck's second report as occurring on May 6.  The court determines that this substantial similarity between the investigative reports and the complaint creates a fact issue as to whether the prosecutor merely relied on the reports rather than exercising her independent judgment. Therefore, the court cannot say as a matter of law that the prosecutor's actions broke the causal chain as to Roxanne's second arrest.  Accordingly, summary judgment as to Kritzeck and Burchett is denied on this claim.

### (B)  Turpitt

Roxanne argues that Turpitt proximately caused her arrest by serving as the complaining witness.  The record establishes that Turpitt played no role in Roxanne's investigation or arrest. Rather, Burchett asked Turpitt to serve as the complaining witness because Burchett was not going to be available at the time the complaint was ready.  Turpitt conducted no investigation into the veracity of the complaint's allegations but rather relied on

---

[18](...continued)
During the conversation, [Roxanne] informs [Flacko] to disregard what he and [Willie] had talked about in jail and that she would take care of the problem.  [Roxanne] still wanted [Flacko] to acquire a handgun for her and told [Flacko] that she wanted a gun she could handle but also one that could cause some damage.  [Roxanne] told [Flacko] that she would be in receipt of some funds to pay for the gun and would contact [Flacko] when those funds became available.  Later that day, [Roxanne] was taken into custody.

(Beitz Aff. Ex. A.)

Burchett's attestations.   Although Roxanne would not have been arrested but for Turpitt's actions, the court determines that Turpitt reasonably relied on the information provided by Burchett, and his actions were thus not a substantial factor in Roxanne's arrest.  Cf. Doran, 409 F.3d at 965 ("[L]aw enforcement officers may rely on information provided by others in the law enforcement community, so long as the reliance is reasonable." (citations omitted)).  Accordingly, Turpitt is entitled to qualified immunity for Roxanne's second arrest.

### 2.    Substantive Due Process

Roxanne argues that Kritzeck and Burchett conducted a reckless investigation in violation of her Fourteenth Amendment guarantee of substantive due process.[19]  To establish a substantive due process violation, a plaintiff must show that an executive official engaged in "conscience shocking" conduct and "that the official violated one or more fundamental rights that are 'deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed.'"  Moran v. Clarke, 296 F.3d 638, 651 (8th Cir. 2002) (en banc) (Bye, J., concurring) (quoting Washington v. Glucksberg, 521 U.S. 702, 720-21 (1997)).  The Eighth Circuit recognizes a substantive due process cause of action for an

---

[19] Roxanne's opposition memorandum voluntarily dismisses the substantive due process claims against Martin and Turpitt.

inadequate investigation so long as the "failure to investigate was intentional or reckless, thereby shocking the conscience." Brockinton v. City of Sherwood, 503 F.3d 667, 672 (8th Cir. 2007) (citing Wilson v. Lawrence County, Mo., 260 F.3d 946, 955-56 (8th Cir. 2001)). This "recklessness standard has a subjective component." Amrine v. Brooks, 522 F.3d 823, 834 (8th Cir. 2008) (citing Wilson, 260 F.3d at 956 n.9).

The record in this case establishes that Burchett and Kritzeck myopically focused on Flacko's initial statement and drew inferences from the phone recordings and wired meetings not supported from an objective perspective. The facts, however, do not show that Burchett and Kritzeck coerced or threatened Roxanne, that they purposely ignored exculpatory evidence or that there was systemic pressure to implicate Roxanne.[20]   See Amrine, 522 F.3d at 835 (examples of reckless investigations). Rather, the detectives' misinterpretation of the evidence, standing alone, fails to establish the requisite subjective component and permits only an inference of negligence. However, "[n]egligent failure to investigate does not violate due process." Brockinton, 503 F.3d at 672 (citation omitted); see also Clemmons v. Armontrout, 477 F.3d

---

[20] Willie's counsel in his state criminal proceeding submitted an affidavit speculating that the conspiracy charges were brought to disrupt the criminal proceedings and to gain leverage on Roxanne. (Waite Aff. ¶¶ 1, 3.)  However, no evidence supports this speculation, and the court does not consider the affidavit evidence of systemic pressure.

962, 966-67 (8th Cir. 2007).  Therefore, the court determines that no genuine issue of fact exists as to Burchett's and Kritzeck's recklessness, and they are entitled to qualified immunity. Accordingly, summary judgment is warranted on this claim.

### B.   Municipal Liability

Roxanne argues that Hennepin County's failure to adequately train its detectives caused her unlawful arrest.  Municipalities are not vicariously liable under § 1983 for an employee's unconstitutional acts.  Szballa v. City of Brooklyn Park, 486 F.3d 385, 389 (en banc) (citing Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978)).  Rather, municipal liability exists only if a plaintiff can establish that either a municipal policy or custom is the moving force behind the constitutional violation.  Wedemeier v. City of Ballwin, 931 F.2d 24, 26 (8th Cir. 1991).  A municipality's inadequate training of employees can serve as the basis of § 1983 liability only when a plaintiff shows that "the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact."  City of Canton v. Harris, 489 U.S. 378, 388-89 (1989).  To establish deliberate indifference, a plaintiff must prove that the municipality "'had notice that its procedures were inadequate and likely to result in a violation of constitutional rights.'"  Jennings v. Wentzville R-IV Sch. Dist., 397 F.3d 1118, 1122 (8th Cir. 2005) (quoting Larson v. Miller, 76 F.3d 1446, 1454 (8th Cir. 1996) (en banc)).

46

At oral argument, Roxanne's counsel indicated that the only record evidence supporting this claim are statements made by Kritzeck, Burchett and Martin in their depositions regarding exculpatory evidence and the degree of proof necessary before making an arrest. The record, however, is devoid of specific evidence about Hennepin County's training or how that training relates to the tasks performed by the officers. Absent such evidence, the deposition testimony and Roxanne's allegations do not create a genuine issue of fact as to Hennepin County's liability. See Robinsette v. Jones, 476 F.3d 585, 591 (8th Cir. 2007). Accordingly, the court grants summary judgment on Roxanne's municipal liability claim.

## III.  Malicious Prosecution Claim

Finally, Roxanne asserts a malicious prosecution claim against Burchett, Kritzeck and Turpitt.[21]   To support a malicious prosecution claim, a plaintiff must establish that: "(1) the action was brought without probable cause or reasonable belief that the plaintiff would ultimately prevail on the merits; (2) the action [was] instituted and prosecuted with malicious intent; and (3) the action ... terminate[d] in favor of the defendant." Kellar v.

---

[21] Roxanne's complaint indicates that this claim applies to all defendants, but she excludes Martin from her argument in her opposition memorandum. However, even if Roxanne maintained this claim against Martin, the court would grant summary judgment because nothing in the record suggests Martin acted with malicious intent.

47

VonHoltum, 568 N.W.2d 186, 192 (Minn. Ct. App. 1997) (citations omitted).

As discussed above, the misinterpretation of the evidence by Burchett and Kritzeck, without more, permits an inference of negligence.  However, the evidence does not support a reasonable inference that Burchett and Kritzeck acted with malicious intent in investigating Roxanne and presenting her case to a prosecutor. Moreover, the record does not support an inference that Turpitt acted with malicious intent by serving as a complaining witness upon Burchett's request.  Therefore, summary judgment on this claim is warranted.

## CONCLUSION

Accordingly, based upon the file, record and proceedings herein, and for the reasons stated, **IT IS HEREBY ORDERED** that defendants' motion for summary judgment [Doc. No. 31] is:

1.   Granted as to all claims against defendants Martin, Turpitt and Hennepin County.

2.   Granted as to the substantive due process and malicious prosecution claims against Burchett and Kritzeck.

    3.    Denied as to the Fourth Amendment claims against Burchett

and Kritzeck.

Dated:  August 19, 2008

                                        s/David S. Doty
                                        David S. Doty, Judge
                                        United States District Court